Filing # 136863853 E-Filed 10/19/2021 04:18:07 PM

IN THE CIRCUIT COURT OF THE 11th
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

Complex Business Litigation Division

CASE No:

STEVEN PAUL KOWALSKI,

     Plaintiff,

v.

BINANCE HOLDINGS LTD., a Cayman Islands
limited liability company,
BAM TRADING SERVICES INC.
(d/b/a Binance.US), a Delaware corporation,
BINANCE ASIA
SERVICES PTE. LTD., a Singapore corporation,
PAYWARD, INC. (d/b/a Kraken) a Delaware
corporation, PAYWARD VENTURES, INC., a
Delaware corporation, BRANDON CHUN YIN NG,
HIU LAM COOKIE CHOI, WAI KIT LO,
LEE KEI LAU, NURLAN NEQMAT OGLY
GULIEV, and
OKSANA ALEKSANDROVNA DOLGOPOLOVA,

     Defendants.

_____/

## **VERIFIED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**

     Plaintiff, Steven Kowalski ("Plaintiff" or "Kowalski"), by and through his undersigned

counsel, for his Complaint against Defendants Brandon Chun Yin Ng ("Brandon"), Hiu Lam

Cookie Choi ("Cookie"), Wai Kit Lo ("Wai"), Lee Kei Lau ("Lee"), Nurlan Neqmat Ogly Guliev

("Nurlan"), Oksana Aleksandrovna Dolgopolova ("Oksana," and together with Brandon, Cookie,

Wai, Lee, and Nurlan, the "Individual Defendants"), Binance Holdings Ltd. ("Binance Holdings"),

EXHIBIT A

BAM Trading Services Inc., d/b/a Binance.US ("Binance.US"), Binance Asia Services Pte. Ltd. ("Binance Asia" and, together with Binance Holdings and Binance.US, "Binance"), Payward, Inc., d/b/a Kraken, and Payward Ventures, Inc. (together with Payward, Inc., "Kraken," and together with Binance, the "Exchanges"), upon actual knowledge as to his own affairs and upon information and belief as to all other matters, alleges as follows:

## PRELIMINARY STATEMENT

1.      Defendants conspired to steal, launder, and then dissipate 1,400.00009854 of Plaintiff's Bitcoin cryptocurrency ("Stolen BTC" or the "Stolen Bitcoin"), which as of the writing of this Complaint is worth more than $80,000,000.00.

2.      Bitcoin ("BTC") is the world's first popular decentralized cryptocurrency.  BTC is a digital asset that uses public cryptography to record, sign and send transactions over the Bitcoin blockchain. The blockchain is a database of ledgers that permanently and publicly record Bitcoin transactions.

3.      BTC was launched in 2009 offering a peer-to-peer electronic payment system that uses cryptocurrency to store and transfer value over the Internet.  The currency does not exist in physical form.  BTC can be used to purchase goods and services, and BTC is traded on exchanges.

4.      BTC is the best-known cryptocurrency internationally.

5.      The value of BTC is highly volatile.  As of 2010, the price of one BTC was $0.08. As of August 31, 2020, the value of one BTC was $11,680.82.  The value of BTC soared in late 2020 and early 2021, reaching an all-time high of $64,863.10 on April 14, 2021.  As of that date, Plaintiff's BTC was worth more than $90,000,000.00.  As of October 11, 2021, the value of one BTC was $57,432.10.

EXHIBIT A

6.    Each bitcoin is comprised of 100,000,000 "satoshis," which is the smallest unit of a bitcoin.  Therefore, bitcoin is divisible up to eight decimal places allowing people to purchase fractions of a bitcoin with as little as one U.S. dollar.

7.    From October 2014 through December 2014, Plaintiff purchased a total of 1,532 BTC for approximately $500,000.00, which he initially stored between two addresses held within a Bitcoin wallet known as a "MultiBit" wallet.

8.    A Bitcoin wallet is a device or program for receiving, sending and storing bitcoin. Bitcoin wallets contain the private keys required to sign Bitcoin transactions.  The Bitcoin wallet provides cryptographic control of a Bitcoin address. Therefore, anyone who knows the private keys required to sign Bitcoin transactions controls the BTC associated with the blockchain address. If a thief can steal the wallet's private keys, the thief can move the BTC in that address to a wallet controlled by the thief.

9.    In December 2017, Plaintiff transferred 1,400.00009854 of his BTC to a Bitcoin wallet known as an "Electrum wallet," which Plaintiff believed to be more secure.  Plaintiff maintained the executable file of the Electrum wallet, including the private keys for Plaintiff's Bitcoin address, on a Universal Serial Bus ("USB") storage drive where Plaintiff's 1,400.00009854 BTC remained until the Individual Defendants stole all of Plaintiff's 1,400.00009854 BTC on August 29, 2020.

10.    The Individual Defendants conspired to orchestrate the theft of Plaintiff's BTC, the subsequent laundering and movement of Plaintiff's Stolen BTC to their accounts at Binance and Kraken, and its dissipation.

11.    In or around August 2020, the Individual Defendants agreed to work together to steal BTC from users who use an Electrum wallet to store, sign, and send their BTC, including

EXHIBIT A

Plaintiff, by executing a sophisticated malware attack, laundering the BTC, and then dissipating the stolen BTC.

12.     The particular malware attack that the Individual Defendants agreed to carry out involved adding a malicious server to the legitimate Electrum network of servers, causing a popup notification to trick users like Plaintiff into downloading a malicious version of the Electrum software falsely identified as an upgrade.  The malicious Electrum wallet software then allows the thieves to hijack the owner's Electrum wallet and send the victim's BTC to a Bitcoin wallet controlled by the thieves.

13.     The Individual Defendants also agreed to attempt to launder the Stolen BTC by executing hundreds of BTC transactions through a group of private wallets in a scheme known as "layering."  Specifically, the Individual Defendants agreed to move Plaintiff's Stolen BTC through layers of transactions typically following a similar pattern, such as splitting the BTC in half, splitting the BTC in half again, combining the BTC, and repeating the sequence. Some of the Stolen BTC were also sent to the exchanges in peeling chains, a sequence where a single first address begins with a relatively large amount of BTC. A smaller amount is then peeled off this larger amount, creating a transaction in which a small amount is transferred to one address (the recipient's address), and the remainder is transferred to a second address belonging to the original sender. This process is repeated by the original sender until the larger amount is pared down, and the recipient's address has received all of the BTC.

14.     The Individual Defendants further agreed that after passing Plaintiff's Stolen BTC through the layering transactions, they would then deposit Plaintiff's Stolen BTC in cryptocurrency exchanges like Binance and Kraken to launder the proceeds of their crime by

EXHIBIT A

exchanging the Stolen BTC for an alternative cryptocurrency, including Monero, making the proceeds untraceable.

15.    On August 29, 2020, while vacationing in his native Australia, Plaintiff connected his USB drive containing the executable file of his Electrum wallet into his new laptop computer and installed the 2017 version of the Electrum wallet.

16.    Unbeknownst to Plaintiff at the time, the version of the Electrum wallet software (version 3.0.2) installed on Plaintiff's laptop was vulnerable to a phishing attack.  Upon connecting his USB drive to the laptop, Plaintiff applied his private key to the wallet, his balance of 1,400.00009854 BTC displayed on the screen, and Plaintiff attempted to withdraw one coin. Plaintiff was then prompted by a popup notification to install the latest version of the Electrum wallet, which he did.

17.    The Individual Defendants, through Brandon while he was in Florida, caused a malicious version of the Electrum wallet software to be uploaded to Plaintiff's laptop.

18.    Plaintiff's Electrum wallet connected with a malicious Electrum server illegally deployed by the Individual Defendants among the legitimate network of Electrum servers so that the Individual Defendants could gain access to a BTC owner's private keys, hijack the owner's wallet, and steal the owner's BTC.

19.    The Individual Defendants used the malicious software to hijack Plaintiff's Electrum wallet, and then signed and sent a transaction of Plaintiff's 1,400.00009854 BTC to a private wallet controlled by the Individual Defendants.

20.    Upon installing what he believed to be a software update, Plaintiff immediately realized that his Electrum wallet was hijacked and the entire balance of BTC in his Electrum wallet, namely    1,400.00009854    BTC,    was    sent    to    a    single    foreign    Bitcoin    address

EXHIBIT A

(bc1qcygs9dl4pqw6atc4yqudrzd76p3r9cp6xp2kny) (the "First Recipient Address").  This Bitcoin address, which was controlled by the Individual Defendants, has been receiving stolen BTC from the ongoing Electrum hack since 2019, as evidenced in the publicly available Blockchain data.  At the time of the theft, Plaintiff's Stolen BTC was worth approximately $16,000,000.00.  It is now worth more than $80,000,000.00.

21.     Plaintiff publicly disclosed the theft on August 29, 2020, by posting on the Bitcoin Abuse Database website that he was victimized by scammers who sent his BTC to Bitcoin address (bc1qcygs9dl4pqw6atc4yqudrzd76p3r9cp6xp2kny).

22.     Plaintiff also reported the crime to law enforcement and hired private investigators to trace and recover his Stolen BTC.

23.     In furtherance of the conspiracy, the Individual Defendants, including Brandon and Cookie while in Florida, executed hundreds of layering transactions through private addresses they controlled.

24.     The Individual Defendants then deposited the Stolen BTC in accounts under their control or the control of their co-conspirators at Binance and Kraken, which are among the largest cryptocurrency exchanges. At binance.com, the Individual Defendants ultimately exchanged Kowalski's Stolen BTC for Monero before withdrawing the Monero to block any further public tracing of the proceeds of their theft.

25.     The information that the BTC deposited with the Exchanges by the Individual Defendants was stolen was accessible by the Exchanges at the time they elected to join the conspiracy.

26.     The pattern of transactions by which the Stolen BTC were transferred from Plaintiff's Electrum wallet to the accounts at Binance and Kraken (*i.e.*, using layers of many

EXHIBIT A

transactions, in small amounts, many of which involved addresses that had never previously been used) exhibits classic characteristics of blockchain money laundering.

27.     Moreover, the timing of these transactions demonstrates close coordination both among the holders of the Binance accounts ("Binance Account Holders") and between the Binance Account Holders and the holders of the Kraken accounts ("Kraken Account Holders").   The transfers to the Binance accounts occurred between September 7, 2020 and February 1, 2021.  The transfers to the Kraken accounts occurred between September 7, 2020 and May 12, 2021.

28.     Plaintiff's Stolen BTC sent to Kraken, a U.S. exchange, went through more layers of intermediate transfers than Plaintiff's Stolen BTC that was sent to Binance.   That is, the Individual Defendants undertook more effort to layer the portion of Plaintiff's Stolen BTC sent to Kraken than the portion of Plaintiff's Stolen BTC sent to Binance.

29.     Binance has known about the theft of Plaintiff's BTC since on or about August 30, 2020, and Binance also knew it was likely that the thieves could attempt to launder Plaintiff's Stolen BTC through Binance.  Plaintiff posted about the theft, including disclosing the Bitcoin address to which the thieves sent Plaintiff's Stolen BTC, on August 29, 2020, and Binance's CEO issued a since deleted tweet about the theft and the Electrum Malware attack.  While Binance's CEO boasted publicly that Binance would blacklist BTC stolen through Electrum hacks (including Plaintiff's), in reality Binance acted in concert with the Individual Defendants to launder Plaintiff's Stolen BTC and dissipate the proceeds of the crime.

30.     The statement by Binance's CEO was publicly reported, and, upon information and belief, the Individual Defendants were aware of it and knew that Binance was aware of the theft. Upon information and belief, because of the conspiracy the Individual Defendants knew that,

EXHIBIT A

despite the statement by Binance's CEO, Binance would provide cover and actively further the scheme to steal, launder, and dissipate Plaintiff's Stolen BTC.

31.    Kraken has known about the theft of Plaintiff's BTC since at least September 7, 2020, when the Individual Defendants deposited a portion of Plaintiff's Stolen BTC with Kraken. Upon information and belief, Kraken likely became aware of the theft before September 1, 2020, because it was publicized within one day after the Individual Defendants initially stole Kowalski's BTC.  In any event, the theft was publicized, and the Stolen BTC was traceable to the First Recipient Address, which is a known criminal address that has been used in the theft of Kowalski's and other victims' BTC since 2019.

32.    On or before September 7, 2020, Binance agreed to join the conspiracy. Specifically, Binance agreed to facilitate the attempted laundering and ultimate dissipation of Plaintiff's Stolen BTC by: (a) accepting Plaintiff's Stolen BTC into the Individual Defendants' Binance accounts despite previously and falsely announcing through its Chief Executive Officer, Changpeng Zhao, that Binance would blacklist the Stolen BTC after learning of the theft in August; (b) declining to implement anti-money laundering ("AML") and know your customer ("KYC") controls that would have required Binance to freeze the Individual Defendants' accounts and report the suspicious activity to regulators and law enforcement; (c) allowing the Individual Defendants to launder and dissipate Plaintiff's Stolen BTC through Binance; (d) concealing material information from Plaintiff and his representatives; (e) making affirmative misrepresentations to Plaintiff and his representatives; (f) refusing to freeze the Individual Defendants' accounts despite knowing the accounts contained Plaintiff's Stolen BTC; and (g) fraudulently maintaining that the Individual Defendants provided a plausible explanation for their patently illegal transactions to steal and attempt to launder Plaintiff's Stolen BTC.

EXHIBIT A

33.     On or before September 7, 2020, Kraken agreed to join the conspiracy. Specifically, Kraken agreed to facilitate the attempted laundering and ultimate dissipation of Plaintiff's Stolen BTC by: (a) accepting Plaintiff's Stolen BTC into the Individual Defendants' (or their co-conspirators') Kraken accounts; (b) declining to implement AML and KYC controls that would have required Kraken to freeze the Individual Defendants' accounts and report the suspicious activity to regulators and law enforcement; (c) allowing the Individual Defendants to launder and dissipate Plaintiff's Stolen BTC through Kraken; (d) concealing material information from Plaintiff and his representatives; and (e) refusing to freeze the Individual Defendants' accounts despite knowing the accounts contained Plaintiff's Stolen BTC.

34.     By participating in the conspiracy, the Exchanges were able to collect significant transaction fees, and, more broadly, the Exchanges were able to further their cultivated image as promoters of anonymous and unregulated financial transactions, which attracts fraudsters and other transacting parties seeking to evade scrutiny and drives revenue and profits for the Exchanges.

35.     Kowalski has uncovered that the Individual Defendants are the owners of the Binance accounts that received Plaintiff's Stolen BTC.

36.     Upon information and belief, the Individual Defendants or their co-conspirators are the owners of the Kraken accounts that received Plaintiff's Stolen BTC.

37.     Approximately 84% of the Stolen BTC was transferred to six addresses at Binance (the "Binance Addresses"), and approximately 15% of the Stolen BTC was transferred to thirty-seven addresses at Kraken (the "Kraken Addresses").[1] (The accounts controlling the Binance

---

[1] The specific addresses at Binance and Kraken are listed in the accompanying Affidavit of Benedict Hamilton at ¶¶ 24-25.

EXHIBIT A

Addresses are referred to as the "Binance Accounts" and the accounts controlling the Kraken Addresses are referred to as the "Kraken Accounts").  Only between 0.06% and 0.24% (depending on the tracing methodology) of the Stolen BTC have not been traced to addresses attributed to a service and were likely paid in transaction fees.

38.     In addition to Binance and Kraken learning on their own about the Individual Defendants' theft of the Stolen BTC and their agreement to join the conspiracy, Kowalski's investigators and lawyers repeatedly, over the course of several months, contacted the Exchanges to report the theft, to advise them that portions of the Stolen BTC had been transferred to specific accounts on their exchanges, and to demand that Binance and Kraken freeze the relevant accounts and otherwise assist in Kowalski's efforts to recover his property.

39.     Law enforcement personnel also reached out to Binance with evidence of the theft and money laundering and to request that Binance stop any further transfers of the Stolen BTC.

40.     However, instead of cooperating with law enforcement and Kowalski's representatives, Binance and Kraken chose to join the conspiracy and have since committed several acts in furtherance of the unlawful scheme.

41.     With full knowledge of the conspiracy and its objective, Binance and Kraken have thwarted Plaintiff's efforts to obtain necessary information, refused to freeze the relevant accounts, and allowed the Individual Defendants to continue to transfer Stolen BTC onto their exchanges. Moreover, Binance (and likely Kraken) has facilitated the further dissipation of Kowalski's Stolen BTC by enabling the Individual Defendants to exchange the Stolen BTC for Monero (another cryptocurrency popular among criminals because of the difficulty to trace it) and to then withdraw the Monero from their accounts, thereby preventing any further tracing.

EXHIBIT A

42.     In addition, the Exchanges have failed to comply with their obligations as money services business under the Bank Secrecy Act ("BSA").  Had the Exchanges performed minimally adequate customer due diligence or implemented adequate AML transaction monitoring software systems as they are required to do, the Individual Defendants' money-laundering activities would have been stopped and the Individual Defendants would not have been able to dissipate Kowalski's Stolen BTC.

43.     Moreover, had Binance and Kraken filed suspicious activity reports ("SARs"), as they were required to based on that patently suspicious pattern of money laundering transactions tied to Kowalski's Stolen BTC, law enforcement would have been alerted to the crime at a point when it could have responded effectively.

44.     Binance and Kraken did not simply turn a blind eye to the financial crimes committed by the Individual Defendants.  Rather, the Exchanges knowingly and willingly agreed to join the conspiracy and actively contribute to the successful object of the conspiracy, which was the theft, laundering, and dissipation of Plaintiff's Stolen BTC, which is currently valued at more than $80,000,000.00.  The massive theft could not have been successfully completed without the Exchanges' knowing, willful, and active participation.

## THE PARTIES

45.     Kowalski is an individual, a citizen of Australia, and a resident of Dubai, United Arab Emirates.

46.     Brandon is an individual, a citizen of the United States, and a resident of Texas. Brandon was a resident of Florida at the time of the events underlying this Complaint. Brandon is also the founder of Eucalyptech, LLC, a Gainesville, Florida-based company incorporated on June 5, 2020 and voluntarily dissolved on June 18, 2021. Eucalyptech's registered address was 55 SW

EXHIBIT A

5th Ter. Apt. 2251, Gainesville, Florida 32601, which was also Brandon's residence from at least August 2019 until April 2021.

47.     Cookie is an individual, a citizen of Hong Kong, and a resident of Texas. Cookie was a resident of Florida at the time of the events underlying this Complaint. Cookie resided at the same address in Gainesville, Florida as Brandon from at least September 2019 until April 2021.

48.      Wai is an individual, a citizen of Hong Kong, and upon information and belief, a resident of Hong Kong.

49.     Lee is an individual, a citizen of Hong Kong, and a resident of Hong Kong.

50.     Nurlan is an individual, a citizen of Russia, and upon information and belief, a resident of Russia currently based in Penza.

51.     Oksana is an individual, a citizen of Russia, and upon information and belief, a resident of Russia currently based in Penza.

52.     Binance Holdings is a limited liability company registered in the Cayman Islands. Its registered office is ICS Corporate Services (Cayman) Limited, P.O. Box 30746, #3-212 Governors Square, 23 Lime Tree Bay Avenue, West Bay, Grand Cayman, KY1-1203, Cayman Islands. Binance is one of the largest, if not the largest, cryptocurrency exchanges in the world. According to its website (www.binance.com), its average daily trading volume is $2.0 billion and it records more than 1.4 million transactions per second. It claims to employ over 1,300 employees in over 20 locations around the world. Binance's corporate structure is opaque: it describes itself as an "ecosystem" of companies but does not identify the location of its corporate headquarters or main office.

53.     Binance.US is a Delaware corporation with its principal place of business at One Letterman Drive, Building C, Suite C3-800, San Francisco, California 94129. Binance.US is a

EXHIBIT A

money services business registered with the U.S. Department of the Treasury Financial Crimes Enforcement Network ("FinCEN").

54.     Binance Asia is a private company incorporated in Singapore.  Its registered address is 1 Wallach Street, #09-03, Guoco Tower, Singapore, 078881.

55.     Payward, Inc. d/b/a Kraken is a corporation incorporated under the laws of Delaware with its principal place of business at 237 Kearney Street, Suite #102, San Francisco, California 94108. Kraken's operations in the United States are carried out through Payward Ventures, Inc., a money services business registered with FinCEN.

56.     Payward Ventures, Inc. is a corporation incorporated under the laws of Delaware with its principal place of business at 237 Kearney Street, Suite #102, San Francisco, California 94108.

## JURISDICTION AND VENUE

57.     The Court has subject matter jurisdiction over this action because the matter in controversy exceeds $15,000.00.

58.     The Court has personal jurisdiction over Brandon and Cookie pursuant to Florida Statutes § 48.193(1)(a)(2) and the United States Constitution because they committed tortious acts against Plaintiff while in this state.

59.     The Court has personal jurisdiction over Wai, Lee, Nurlan, and Oksana pursuant to Florida Statutes § 48.193(1)(a)(2) because they engaged in numerous electronic communications into Florida in the commission of torts against Plaintiff.

60.     The Court has personal jurisdiction over Binance and Kraken pursuant to Florida Statutes § 48.193(1)(a)(1) and the United States Constitution because the Exchanges engaged in business in Florida.

EXHIBIT A

61.     Independently, this Court has personal jurisdiction over Defendants, pursuant to Florida Statutes § 48.193(1)(a) and the United States Constitution because each of the Defendants is part of a conspiracy to steal, launder, and dissipate Kowalski's BTC, and two of the co-conspirators (Brandon and Cookie) committed tortious acts in Florida in furtherance of the conspiracy.

62.     Venue is proper in this Circuit because none of the Defendants currently resides in Florida, and the Court has personal jurisdiction over Defendants and subject matter jurisdiction over Plaintiff's causes of action.

## GENERAL ALLEGATIONS

### I.     The Plaintiff

63.     Kowalski was born in Sydney, Australia in 1975.  Kowalski lived in Australia for most of his life, before moving to Dubai, United Arab Emirates in 2018.

64.     Kowalski first became involved in the cryptocurrency space in 2014.

65.     Kowalski has invested a significant portion of his wealth in BTC.

### II.     BTC and Cryptocurrency Exchanges

66.     Bitcoin is a well-known and heavily traded cryptocurrency.  Bitcoin was the world's first popular decentralized cryptocurrency, which is a digital asset that uses public cryptography to record, sign and send transactions over the Bitcoin blockchain.  The blockchain is a database of ledgers that permanently and publicly record Bitcoin transactions.

67.     Bitcoin was launched in 2009 by an anonymous computer programmer or group of computer programmers using the pseudonym "Satoshi Nakamoto."  Bitcoin offers a peer-to-peer electronic payment system that uses cryptocurrency to store and transfer value over the internet.

EXHIBIT A

The currency does not exist in physical form.  Bitcoin can be used to purchase goods and services and is traded on exchanges.

68.     The value of BTC is highly volatile.  As of 2010, the value of one BTC was $0.08.  As of August 31, 2020, the value of one BTC was $11,680.82.  The value of BTC soared in late 2020 and early 2021, reaching an all-time high of $64,863.10 on April 14, 2021.  As of October 11, 2021, the value of one BTC was $57,432.10.

69.     Each BTC is comprised of 100,000,000 satoshis, which is the smallest unit of a bitcoin.  Therefore, bitcoin is divisible up to eight decimal places allowing people to purchase fractions of a bitcoin with as little as one U.S. dollar.

70.     Bitcoin does not exist in physical form.  Rather it is a digital asset that exists solely in electronic or digital form.  Bitcoin is not linked to any particular country, nor is it regulated by any central monetary authority.

71.     Like other cryptocurrencies, bitcoin can be used to purchase goods and services, and can also be traded on virtual currency exchanges.

72.     A person can receive bitcoin by generating a unique "address," which is a series of numbers and letters that is then shared with the sender, much like an email address. To access an address, a public or private "key" is needed. A public key allows a person to receive transactions, whereas a private key allows a person to sign and send Bitcoin transactions.

73.     The person's addresses, and public and private keys, can be held within a digital "wallet."  A Bitcoin wallet is a device or program, similar to a database, for holding and sending BTC.  The wallet stores a log of incoming and outgoing transactions.  Because the wallets contain the private keys needed to sign Bitcoin transactions, anyone who knows the private key can control the coins associated with that address.  A Bitcoin wallet actually provides the cryptographic control

EXHIBIT A

over a blockchain address.  Thus, if an attacker can steal a wallet's private keys, the attacker can move the BTC in that address to another wallet controlled by the attacker.

74.     There are four types of cryptocurrency wallets.  A desktop wallet is installed on a desktop or laptop computer and provides the user with complete control over the wallet.  Mobile wallets have the same function but are stored on a mobile device such as a smart phone.  A web wallet is an online service that can receive, send and store cryptocurrency on behalf of the user and can be accessed from any device.  Hardware wallets are the most secure type of Bitcoin wallet because the private keys are stored on a physical device such as a USB drive that cannot access the Internet.

75.     While cryptocurrency addresses are pseudonymous, in that the identity of a user behind an address remains unknown unless it is revealed by the user or the exchange, transactions between addresses are stored publicly and permanently. In the case of Bitcoin, all transactions between Bitcoin addresses are stored on what is known as the "blockchain ledger." As such, the flow of specific Bitcoin transactions can be tracked by following the transactions involving that specific bitcoin on the blockchain ledger.

76.     Cryptocurrency exchanges, like the ones operated by Binance and Kraken, are businesses that allow their customers to trade cryptocurrencies for other assets, such as other digital currencies and traditional fiat money such as U.S. Dollars. To use an exchange, a customer opens an account, then makes a deposit by sending cryptocurrency to a specific deposit address controlled by the exchange. The deposit address is typically allocated to a single customer. The value of the cryptocurrency sent to that deposit address is then credited to the customer's account with the exchange (using an internal ledger), and the cryptocurrency itself is moved from the customer's

EXHIBIT A

deposit address into a "hot wallet" address, or "pooling" address, used by the exchange to store cryptocurrency received by multiple customers.

77.     When a customer wishes to send his or her cryptocurrency to another user on the same exchange, the exchange will usually, on the exchange's internal ledger, debit the sending customer's account by the value of cryptocurrency and credit the receiving customer's account without actually moving any cryptocurrency. When a customer wants to send his or her cryptocurrency to either a private address or an address at another exchange, the exchange will debit the sending customer's account on the exchange's internal ledger and send cryptocurrency to the receiving party from whichever of its "hot wallet" addresses is most convenient to send at that time.

78.     The use of this internal ledger system by exchanges breaks the continuity of cryptocurrency transfers on the blockchain ledger. As a result, without information from the executing exchange detailing the receiving party's address, a sending customer's transfers out of an exchange cannot be publicly traced.

### III.     Kowalski Invests in Bitcoin

79.     Between October and December 2014, Kowalski purchased 1,532 BTC for $620,022 Australian dollars (approximately $500,000 U.S. dollars).  Kowalski purchased the BTC through Bitstamp, a cryptocurrency exchange.

80.     Kowalski initially stored the 1,532 BTC in two addresses in a "MultiBit wallet," which at the time was a BTC wallet program for Windows, MacOs and Linux.

81.     In December 2017, Kowalski moved 1,400.00009854 BTC from the MultiBit wallet to another Bitcoin wallet, called an Electrum wallet, which Kowalski believed at the time would be more secure. He kept a copy of the executable file of the Electrum wallet, including

EXHIBIT A

private keys for his Bitcoin address, and stored them on a USB stick.   Because Kowalski's BTC investment was a long-term investment, he did not access his Electrum wallet until 2020.

## IV.   **Previous Electrum Wallet Hacks**

82.   Unbeknownst to Kowalski, fraudsters like the Individual Defendants were able to exploit the Electrum wallet to commit malware attacks to steal BTC from unsuspecting Electrum wallet users.

83.   Electrum wallets prior to version 3.3 are known to be vulnerable to a publicized phishing attack whereby a malicious server is added into the legitimate Electrum network. This malware attack results in a popup notification inviting the victim to download an "upgrade," but which then in fact installs a malicious version of the Electrum wallet.

84.   Electrum does not maintain the entire state of the Bitcoin blockchain.  Instead, the Electrum wallet relies on a distributed network of gateway servers that Electrum does not own or control, which can query the entire blockchain state and transmit transactions on its behalf.  These gateway servers are anonymous and are called "Electrum X servers."

85.   As new Electrum X servers come online, they announce themselves to the rest of the network and commence accepting connections from Electrum wallets.  The only verification of the anonymous Electrum X servers is to confirm that the provided hostname is consistent with the IP address of the node attempting to join the network.

86.   When an Electrum wallet initially connects to the network it has a hard-coded list of trusted servers.  However, after the first connection, the Electrum wallet actively discovers and saves additional servers.

87.   In the case of a phishing attack like the one orchestrated by the Individual Defendants against Kowalski and others, the Electrum wallet discovers and connects to a malicious

EXHIBIT A

Electrum X server which in turn triggers a popup dialogue that the attackers use to hijack the Electrum wallet and steal the BTC by transferring it to a BTC address controlled by the criminals. The more malicious Electrum X servers in the network, the higher the chance that Electrum wallet users will be attacked.

88.     Wide scale and significant instances of theft, fraud, and software vulnerabilities involving Electrum wallets have been publicly reported since as early as 2017. While initial reporting from November 2017 to early 2019 does not name the specific malicious vectors for the thefts, certain Bitcoin addresses have been linked to the thefts since at least early 2019.

89.     Major cryptocurrency exchanges such as Binance and Kraken are required to maintain AML compliance software that monitor and flag adverse media reporting concerning incidents and customers that may pose an AML risk. Given the reporting in trade publications and public forums concerning the cyberattacks on Electrum wallets, it is highly unlikely that Binance and Kraken were unaware of these incidents.

90.     Indeed, Binance was well aware of the risk that its exchange was being used to launder proceeds of crime linked to stolen funds from Electrum wallet exploits. The German State Criminal Police (known as the Landeskriminalamt or "LKA") contacted Binance in 2019 and provided Binance with information concerning addresses that had received funds stolen through Electrum wallet exploits.

91.     While the Electrum wallet developer has now disabled the vulnerable error popups, in August 2020 they were still operational when Plaintiff traveled to Australia for a holiday.

## V.     The Individual Defendants Conspire to Steal Kowalski's BTC

92.     In or before August 2020, the Individual Defendants entered into a conspiracy to deploy one or more malicious Electrum X servers among the distributed network of Electrum X

EXHIBIT A

servers so that they could hijack Electrum wallets and steal cryptocurrency stored in the Electrum wallets by transferring the cryptocurrency to wallets controlled by the Individual Defendants.

93.     The Individual Defendants further agreed that they would attempt to obfuscate the source of the stolen cryptocurrency and conceal their wrongdoing by executing numerous layering transactions before depositing the stolen BTC in accounts they controlled at cryptocurrency exchanges, including Binance and Kraken.

94.     The Individual Defendants further agreed that they would deposit the stolen BTC in accounts they controlled at cryptocurrency exchanges, including Binance and Kraken, to launder the stolen BTC and dissipate it, including by exchanging it for other forms of cryptocurrency that would not be traceable back to the stolen BTC.

95.     At least four of the Individual Defendants knew each other before the conspiracy and grew up together in Hong Kong.

96.     Brandon and Cookie lived together in the same apartment in Gainesville, Florida from at least September 2019 to April 2021, including at the time of the events alleged in this Complaint.  On or about April 21, 2021, Brandon and Cookie jointly purchased a house in Katy, Texas.

97.     Moreover, Brandon, Wai, and Lee were classmates at the Diocesan Boys' School in Hong Kong. At the same time, Cookie was a student at the Diocesan Girls' School in Hong Kong.

98.     In or before August 2020, in furtherance of the conspiracy, the Individual Defendants deployed one or more malicious Electrum X servers into the distributed network of Electrum X servers.

EXHIBIT A

99.     On August 29, 2020, while Kowalski was in Australia, he connected the USB stick containing his 1,400.00009854 BTC to his new laptop and installed the 2017 version of the Electrum wallet.

100.    Kowalski installed a legitimate, but outdated version of the Electrum wallet software (version 3.0.2).  Beginning with version 3.3, the Electrum wallet developer modified the software to prevent popup issues.

101.    Kowalski then applied his private key to the wallet, and the balance in his BTC address (1,400.00009854 BTC) displayed on the screen.

102.    After downloading the legitimate version of the Electrum software, Kowalski attempted to withdraw one coin and saw a further pop-up prompting him to install the latest version of the Electrum wallet, which he did, choosing Windows 64 as the operating system when prompted.

103.    Unbeknownst to Kowalski, his Electrum wallet connected with a malicious Electrum X server controlled by the Individual Defendants, and in particular by Brandon while he was in Florida.

104.    The Individual Defendants, and in particular Brandon while he was in Florida, surreptitiously uploaded malicious software onto Plaintiff's laptop and gained control over Kowalski's Electrum wallet.  Having illegally hacked into Plaintiff's laptop, the Individual Defendants hijacked Kowalski's Electrum wallet, and stole all of Plaintiff's BTC stored there by sending the 1,400.00009854 BTC to the First Recipient Address (bc1qcygs9dl4pqw6atc4yqudrzd76p3r9cp6xp2kny), which is a BTC address controlled by the Individual Defendants.

EXHIBIT A

105.    Upon installing what he believed to be a software update by double clicking on the download file, Kowalski immediately observed that his Electrum wallet had been hijacked and the entire balance of his 1,400.00009854 BTC was sent to a foreign Bitcoin address.

106.    The transaction was broadcast to the Bitcoin Network in block 645845, at or around 10:55 UTC on August 29, 2020, just minutes after the malicious Electrum software was fraudulently installed on Kowalski's laptop by the Individual Defendants.

107.    At the time they were stolen on August 29, 2020, Kowalski's 1,400.00009854 BTC were worth approximately $16,000,000.00.  As of October 11, 2021, the Stolen Bitcoin were worth more than $80,000.000.00.

108.    On August 29, 2020, Kowalski posted on the website Bitcoin Abuse Database about the criminal BTC address (bc1qcygs9d14pqweatc4yqudrzd76p3r9cpexp2kny) controlled by the Individual Defendants:  "Today (29.08.20), I installed an old version of electrum that I had saved from when I last accessed my wallet in 2017.  When attempting to send funds I was prompted to do a security update.  Upon downloading the file and installing it, my entire balance of 1,400 BTC was withdrawn to the scammers address." Kowalski made a second post about the theft on GitHub on August 30, 2020.

109.    On or about August 30, 2020, Binance learned about the malware attack against Kowalski.  On August 31, 2020, a day after the theft of Kowalski's Bitcoin became public knowledge, it was reported that Binance's CEO had purportedly moved to blacklist the stolen funds from Binance's cryptocurrency exchange. Binance's CEO stated that users should "beware of this Electrum official update."[2]

---

[2] The tweet from Binance's CEO was reported in at least two articles on CoinDesk and CoinTelegraph on August 31 and September 1, 2020, but the tweet has since been deleted.

EXHIBIT A

110.    However, as Kowalski would later learn, Binance did not take any steps to block the Stolen BTC (except, at most, by freezing the accounts for a few days in October 2020).  Quite to the contrary, Binance actively joined the conspiracy and facilitated the laundering and dissipation of Kowalski's Stolen Bitcoin.

111.    Kraken learned about the malware attack against Kowalski no later than September 7, 2020, when the Individual Defendants first deposited a portion of the Stolen Bitcoin with Kraken, and there was public reporting about the address that received Kowalski's Stolen Bitcoin. Upon information and belief, Kraken learned about the attack before September 1, 2020 from the public posting of the incident.

112.    Not only were Electrum wallet theft events widely reported, especially in the cryptocurrency industry publications, but the First Recipient Address (*i.e.*, bc1qcygs9dl4pqw6atc4yqudrzd76p3r9cp6xp2kny, the address to which the Individual Defendants transferred Kowalski's Stolen Bitcoin) was publicly reported online as being associated with the Electrum hack as early as August 9, 2020 – before the theft of Kowalski's Bitcoin took place.

113.    The theft of Kowalski's Bitcoin was publicly mentioned on Reddit.com as connected to the Electrum wallet compromise after Kowalski himself posted about the incident on GitHub.com on August 30, 2020.

114.    On September 5, 2020, Kowalski reported the theft and subsequently provided a witness statement to the local police at Surry Hills Police Station in New South Wales, Australia.

115.    Kowalski also promptly hired investigators to look into what had happened and to help him trace and recover his Stolen Bitcoin.

EXHIBIT A

116.   On October 22, 2020, Kowalski formally retained global investigations firm Kroll Associates U.K. Limited ("Kroll") and crypto analytics firm Coinfirm Limited ("Coinfirm") to trace and locate his Stolen Bitcoin.

117.   Kroll took a forensic image of Kowalski's laptop to determine what evidence was available in relation to the theft.  An examination of the hard drive confirmed that Kowalski unwittingly installed software considered malicious by an aggregation of anti-virus software.

118.   Kroll and Coinfirm investigated and traced the path of the Stolen Bitcoin from the point at which they were transferred out of Kowalski's Electrum wallet on August 29, 2020.

119.   The results of their analysis show that, depending on the tracing methodology used, between 1,377.80723881 and 1,379.15748206 BTC of the Stolen Bitcoin have been traced to the following:

   a.   between 1,173.54217541 BTC and 1,175.37016434 BTC have been traced to the six Binance Addresses between September 7, 2020 and February 1, 2021; and

   b.   between 203.78731772 BTC and 204.50302364 BTC have been traced to the thirty-seven Kraken Addresses between September 7, 2020 and May 12, 2021.

120.   The Individual Defendants are the owners of the six Binance Addresses into which the Stolen Bitcoin were transferred:

   a.   Brandon owns Binance address *139H2VNVNojzJjFeBXT75XtfJ83yeHPCh8* (the "First Binance Address");

   b.   Cookie owns Binance address *14zY4guXw2sKBu4XYGWnGc3cpNSq65Mzpw* (the "Second Binance Address")[3];

_____

[3] Chronologically, Cookie's Binance Address was the first to receive Stolen Bitcoin.

EXHIBIT A

c.  Wai owns Binance address *1BYawS5M6YGTdidaDh9b2BRnu5RoLzUquZ* (the "Third Binance Address");

d.  Lee owns Binance address *1NzbXCqtCFBKDMgEFWSqrYp2dzre9PbpxK* (the "Fourth Binance Address");

e.  Nurlan owns Binance address *12XKQKQbCUXo66optwY5sbg5t4E3M4Jtqa* (the "Fifth Binance Address"); and

f.  Oksana owns Binance address *1Au6KPRqfrYfi7pCTePSGjgQgMJV9iXyoY* (the "Sixth Binance Address").

121.  The owners of the thirty-seven Kraken Addresses are unknown to Kowalski at this time, but it is highly likely that the Kraken Addresses are also controlled by one or more of the Individual Defendants.  In the unlikely event the Kraken Addresses are not owned by the Individual Defendants, then at a minimum those owners are acting in concert with one another and with the Individual Defendants.

122.  Thirty-six of the thirty-seven addresses at Kraken were created solely for the purpose of receiving the Stolen Bitcoin. Each of those addresses has been involved in only two transactions: one to receive Stolen Bitcoin and another to send the Stolen Bitcoin to Kraken's "hot wallet." The remaining address, like the other thirty-six Kraken Addresses, had not been involved in any transactions before receiving the Stolen Bitcoin, but has received funds in one other transaction since then (as recently as May 12, 2021).

123.  The First and Second Binance Addresses (those owned by Brandon and Cookie) received most of the Stolen Bitcoin transferred to Binance. Those accounts have been active since, respectively, August 11, 2018 and September 29, 2019, having received more than 2,445 BTC collectively since they were opened (valued at $29,435,429.93 at the time those transactions took

EXHIBIT A

place), of which between 896 and 898 can be traced back to the Stolen Bitcoin. It is clear from the transaction history that these account holders have been longstanding and significant customers of Binance. The other four Binance addresses were not involved in any transactions until they received Kowalski's Stolen Bitcoin. And two of those addresses have only ever been recipients to transactions that carried Stolen Bitcoin.

124.    Kroll and Coinfirm have verified their conclusions using five different tracing methodologies. All five methodologies lead to the same findings and identify the same six Binance Addresses and the same thirty-seven Kraken Addresses as having received Kowalski's Stolen Bitcoin. Moreover, the total value of Stolen Bitcoin traced to those addresses is only marginally different depending on which of the five tracing methodologies is employed.

125.    Kroll and Coinfirm's analyses also demonstrate that there has been very little mixing of the Stolen Bitcoin with "new" funds, which made the Stolen Bitcoin relatively straightforward to identify and claim.

126.    In total, the Binance and Kraken Accounts received all but approximately 20 BTC of the Stolen Bitcoin. Only between 0.06% and 0.24% of the Stolen Bitcoin have not been traced to addresses attributed to a service and were likely paid in transaction fees.

127.    It is not possible to trace the Stolen Bitcoin beyond the Binance and Kraken exchanges.

128.    Once the Stolen Bitcoin had been transferred to the Binance Accounts, the Individual Defendants each adopted a pattern of using the Stolen Bitcoin to buy Monero (another digital currency, about which the FBI and other law enforcement agencies have expressed concern given its use among criminals). After trading the Stolen Bitcoin for Monero, the Monero was withdrawn by the Individual Defendants from their respective Binance Accounts and cannot be

EXHIBIT A

traced.  The overwhelming majority of the withdrawals were made by Brandon and Cookie from Florida.

129.    Kowalski does not presently know whether and to what extent any of his Stolen Bitcoin remains in any of the Kraken Accounts because to date Kraken has obstructed Kowalski's investigation and refused to provide any information about these accounts or their owners.

**VI.**    **The Individual Defendants' Obvious Efforts to Launder Plaintiff's Stolen BTC**

130.    The Individual Defendants engaged in obvious efforts to launder Kowalski's Stolen Bitcoin and conceal their illegal conduct.  The Individual Defendants' attempt to launder Kowalski's Stolen Bitcoin confirms that they are criminal conspirators who orchestrated the theft of Kowalski's Bitcoin, the subsequent laundering and movement of the Stolen Bitcoin to their accounts at Binance and Kraken, and then the dissipation of Kowalski's Stolen Bitcoin.

131.    Directly before the Individual Defendants deposited the Stolen Bitcoin into their accounts with Binance and Kraken, the Individual Defendants moved the Stolen Bitcoin through hundreds of transactions in a process known as "layering," often using addresses that had never previously been used (so-called "single-use addresses"). The layering followed a similar pattern. For example, the funds would be split in two, split in two again, then merged back together, then split in two and so on.  Together with the fact that the Stolen Bitcoin were transferred to a large number of single-use addresses, this layering has no discernible purpose other than to obscure the source of funds and is a characteristic associated with blockchain money laundering.

132.    As part of the layering process, the Stolen Bitcoin were broken down and transferred in small increments in up to 166 transactions to Binance and thirty-seven transactions to Kraken. The average transfer size was 7.25 BTC for funds that went to Binance and 5.52 BTC

EXHIBIT A

for funds that went to Kraken. This pattern of frequent transfers at low amounts in a relatively short time frame is typical of a money launderer's attempt to obfuscate the source of funds.

133.    The most common way for a genuine market participant to purchase or trade cryptocurrency is from a service, typically an exchange or trading platform. Direct transactions between market participants are unusual unless the actors know each other well or are part of the same organization. That is because transactions on the blockchain require a very large degree of trust.  Both actors must trust that if they release their funds, the other party will reciprocate. The transactions are irreversible, so if one party sends funds and the counterparty reneges, the sending party cannot withdraw or reverse its transfer.

134.    However, between the theft from Kowalski's Electrum wallet and the transfers into the Individual Defendants' accounts at Binance and Kraken, there are no addresses that have been attributed to a service or that could conceivably be operated by a service. Such addresses would typically receive funds from multiple sources; in this case, in contrast, most of the addresses were single use addresses and only received funds from a single source, namely Kowalski's Electrum wallet.

135.    There is no plausible innocent explanation for the Individual Defendants' receipt of Stolen Bitcoin into their accounts. Even if some of the Individual Defendants were to contend that they are not the original thief, then they could only have received the Stolen Bitcoin either at the very beginning or very end of the trace. In either circumstance, they were co-conspirators with the original thief, having received Stolen Bitcoin in the knowledge that they were stolen.

136.    The Individual Defendants who received the Stolen Bitcoin between the theft on August 29, 2020 and the first transfers to Binance and Kraken on September 7, 2020, participated

EXHIBIT A

in the layering of the Stolen Bitcoin in hundreds of transactions before depositing them into the Binance and Kraken Accounts.

137.    In the alternative, if any of the Individual Defendants did receive Stolen Bitcoin subsequently, that would mean that they needed to correspond with a counterparty that had the same source of funds up to 203 times during that period.  For example, the four Binance addresses that were not involved in any transactions until they received the Stolen Bitcoin, and whose accounts were likely created specifically for the purpose of receiving the Stolen Bitcoin, received approximately 278 BTC of the Stolen Bitcoin broken down into 39 transfers sent across 145 days. These are very large sums of money for these defendants to have received from an unknown third-party market participant given the level of trust that would be involved in such a transaction. Moreover, they did not stop transacting with this counterparty even though a trace of the blockchain would have revealed that the source of funds was a known criminal address.

138.    The Stolen Bitcoin were not mixed with other "new" funds. Transactions that carried the Stolen Bitcoin to the Binance Accounts and Kraken Accounts contained the Stolen Bitcoin, and almost entirely the Stolen Bitcoin alone.

139.    The Fourth Address continued to receive Stolen Bitcoin into January 2021, even after Binance had allegedly warned the owner not to transact with the same individual. Indeed, none of the holders of the Binance Accounts and Kraken Accounts ceased transacting with this counterparty even though a trace on the blockchain would have revealed that the source of funds was a known criminal address.

140.    The Individual Defendants coordinated the distribution of the Stolen Bitcoin both among the Individual Defendants who owned and controlled the Binance Accounts and between

EXHIBIT A

the Individual Defendants and the holder(s) of the Kraken Accounts (who likely include all or at least some of the Individual Defendants).

141.    An address at Kraken and an address at Binance were the first two addresses to receive the Stolen Bitcoin. The first transfer of Stolen Bitcoin to Kraken was on September 7, 2020, approximately one hour after the first transfer of Stolen Bitcoin to Binance.

142.    For the next five weeks until October 12, 2020, there were approximately 122 further transfers of Stolen Bitcoin, but all of them were to Binance.

143.    The next transfer to Kraken did not take place until October 12, 2020, which was immediately after Binance allegedly warned the holder of the First Binance Address not to transact with the individual from whom he had purportedly been receiving Stolen Bitcoin. Indeed, close to ninety-nine percent (99%) of the approximately 204 BTC that have been sent to Kraken were sent to the Kraken Addresses *after* that warning. This is indicative of deliberate coordination in the use of the Kraken and Binance Accounts, with the Kraken Accounts being used to receive more funds after the perpetrators became aware that Binance was raising questions as to the source of funds.

144.    The distribution of funds to the Fourth Binance Address (owned by Lee) is connected to the distribution of funds to the Fifth and Sixth Binance Addresses (owned by Nurlan and Oksana, respectively) by what is known in blockchain analytics as a "peeling chain." The Stolen Bitcoin were transferred to the Fourth Address in January 2021 and later to the Fifth and Sixth Addresses within the same chain.  That is, all three of those addresses can trace their funds back to the same peeling chain.

145.    The Fifth and Sixth Addresses did not receive Stolen Bitcoin until after Kroll wrote to Binance on January 15, 2021, to explain that Stolen Bitcoin had continued to flow into the First Address. This also evidences coordination among the Individual Defendants.

EXHIBIT A

146.     The Individual Defendants were a group of closely connected individuals acting in concert (including at least the Individual Defendants and possibly others) to control the accounts that have received Kowalski's Stolen Bitcoin.  For example, two devices owned or used by Brandon have regularly been used not only to log into Brandon's Binance account, but also Cookie's Binance account.   In addition, Brandon made seventy-four percent (74%) of all withdrawal requests across the six Binance Accounts.  Moreover, Brandon, Cookie, Wai, and Lee together made ninety-five (95%) of all withdrawal requests.   The IP addresses most often associated with Brandon and Cookie were also used to make withdrawals from Lee's and Wai's Binance accounts.

## VII.   **Binance and Kraken Join the Conspiracy**

147.     The Exchanges have cultivated and promoted the theme that cryptocurrency in general, and their respective exchanges in particular, offer private, anonymous, and unregulated financial transactions.

148.     The Exchanges know that while these characteristics may appeal to legitimate market participants, they also attract criminals and fraudsters.

149.     For the Exchanges, the more transactions that occur through their platforms, the more money the Exchanges make.  The Exchanges know that increased regulation and scrutiny of the transactions occurring through the Exchanges would undermine their carefully cultivated images as unregulated, anonymous platforms for trades and transactions that will not be scrutinized, no matter how obvious the transactions' red flags.

150.     The Exchanges also know that cooperating with criminal and private investigations into their customers' conduct on their platforms would drive away a significant portion of their

EXHIBIT A

customer base and slow their growth.  Therefore, the Exchanges have taken dramatic steps to avoid regulators and scrutinize their customers' activity in the Exchanges.

151.    For example, it is well-publicized, including by Kraken itself, that Kraken ceased permitting New York and Washington state customers to use Kraken's exchange precisely so it could avoid regulation by those states.

152.    As reported by Forbes on October 29, 2020, an internal document leaked to Forbes revealed an extensive strategy by Binance to achieve its goals of "U.S. enforcement mitigation," to "insulate Binance from U.S. enforcement."  Among the strategies revealed in the leaked document was maintaining that Binance has no office, and the strategic use of virtual private networks ("VPNs") to obscure traders' locations as a way to evade regulatory scrutiny.

153.    In a podcast interview in May 2020, Binance's founder and CEO Zhao stated that "the beauty of blockchain" is that "Bitcoin doesn't have an office. We have people from around 50 places in the world," and that offices, entities, headquarters and bank accounts "don't have to exist for blockchain companies" like Binance. The secrecy surrounding Binance and its operations are signs that it wishes to avoid regulatory scrutiny in any jurisdiction.

154.    In recent months, Binance has come under increasing scrutiny by regulators in various jurisdictions. For example, on May 13, 2021, Reuters reported that Binance is under investigation by the U.S. Department of Justice and the IRS. The report stated that "the officials who probe money laundering and tax offenses have sought information from individuals with insight into Binance's business."

155.    In June 2021, the Japanese Finance Services Authority warned that Binance was operating in Japan without permission and was not registered to conduct business in the country.

EXHIBIT A

156.    Also in or around June 2021, Binance was forced to stop servicing users in Ontario to avoid facing charges from the Ontario Securities Commission for failing to comply with province regulations.

157.    On June 25, 2021, Reuters reported that the United Kingdom's Financial Conduct Authority had "said Binance, one of the world's largest cryptocurrency exchanges, cannot conduct any regulated activity [in the United Kingdom] and issued a warning to consumers about the platform, which is coming under growing scrutiny globally."

158.    On July 1, 2021, the Cayman Islands Monetary Authority also issued a warning that Binance Holdings, as well as the wider Binance group, were not registered or authorized with it to run a crypto exchange from the territory.

159.    As recently as July 1, 2021, the Monetary Authority of Singapore said that it would follow up with Binance Asia after Binance Holdings came under scrutiny from authorities around the world.

160.    On July 2, 2021, Thailand's financial regulator, the Securities and Exchange Commission, filed a criminal complaint against Binance for "soliciting the public to use its services" and "operating a digital asset business without a license."

161.    On July 6, 2021, the *Financial Times* reported that Binance would suspend euro bank deposits through the Single Euro Payments Area network. Although Binance described this as a "temporary" measure, the *Financial Times* reported that this restriction "marks the latest prohibition on customers moving funds on to the exchange from conventional banks and other types of financial accounts."

162.    On August 18, 2021, Law.360 reported that the Dutch Central Bank said Binance is operating illegally in the Netherlands by providing cryptocurrency services without the required

EXHIBIT A

registration, making it out of compliance with ani-money laundering laws and the Anti-Terrorist Financing Act.

163.    Given the Exchanges' hostility toward regulation and scrutiny of the transactions on its platforms, and knowing that Brandon and Cookie had prior experience as customers of Binance, including to launder stolen BTC, it is unsurprising that the Individual Defendants felt comfortable conspiring with the Exchanges and utilizing their platforms to launder and dissipate Kowalski's Stolen Bitcoin.

164.    Indeed, although users in the United States are not permitted to use the binance.com platform for regulatory reasons (*see* Binance's Terms of Use, publicly available at https://www.binance.com/en/terms), Brandon and Cookie apparently used binance.com to receive and trade Kowalski's Stolen Bitcoin in Florida.

165.    On a macro level, the Exchanges benefit from providing a friendly platform for fraudsters and other parties keen on avoiding scrutiny, because it drives transaction volume and therefore revenue to the cryptocurrency exchanges that are so friendly.

166.    On a micro level, Binance and Kraken had a financial incentive to conceal and assist the Individual Defendants' wrongdoing because these exchanges earned significant fees from these transactions.  For example, there were 2,628 trades in the six Binance Accounts between September 7, 2020 (the date of the first transfer of Kowalski's Stolen Bitcoin) and March 24, 2021.

167.    The Exchanges also generated fees from the Individual Defendants on other transactions that the Individual Defendants engaged in on the Binance exchange, for example in the same six accounts prior to September 7, 2020 or after March 24, 2021.

EXHIBIT A

### A.  Binance's Role in the Conspiracy

168.  On or before September 7, 2020, Binance agreed to join the conspiracy. Specifically, Binance agreed to facilitate the attempted laundering and ultimate dissipation of Plaintiff's Stolen BTC by: (a) accepting Plaintiff's Stolen BTC into the Individual Defendants' Binance accounts despite previously and falsely announcing through its Chief Executive Officer, Changpeng Zhao, that Binance would blacklist the Stolen BTC after learning of the theft in August; (b) declining to implement AML and KYC controls that would have required Binance to freeze the Individual Defendants' accounts and report the suspicious activity to regulators and law enforcement; (c) allowing the Individual Defendants to launder and dissipate Plaintiff's Stolen BTC through Binance; (d) concealing material information from Plaintiff and his representatives; (e) making affirmative misrepresentations to Plaintiff and his representatives; (f) refusing to freeze the Individual Defendants' accounts despite knowing the accounts contained Plaintiff's Stolen BTC; and (g) fraudulently maintaining that the Individual Defendants provided a plausible explanation for their patently illegal transactions to steal and attempt to launder Plaintiff's Stolen BTC.

169.  Binance was on notice that Stolen Bitcoin had been transferred to its exchange.  The theft was publicized no later than August 30, 2020.  Binance's CEO publicly acknowledged the theft.

170.  The First Recipient Address had been publicized multiple times as a BTC address utilized by criminals to receive stolen BTC.  Despite the Individual Defendants' attempts to obfuscate the source of the BTC, as demonstrated through the investigation performed by Kowalski's investigators, the BTC deposited in the Individual Defendants' accounts at the Exchanges was readily traceable back to Kowalski's Electrum wallet.

EXHIBIT A

171.    In addition, Kowalski's representatives repeatedly and specifically informed Binance about the criminal activity that the Individual Defendants were carrying out through their Binance Accounts.

172.    Despite that knowledge, Binance agreed to conspire with the Individual Defendants rather than assisting Kowalski and law enforcement.

173.    Binance failed to comply with its AML obligations under the BSA[4] by failing to perform customer due diligence and transaction monitoring in order to investigate suspicious money laundering activity and then timely file a SAR with FinCEN as legally required under the BSA.  Binance's repeated failure and refusal to do so constitute illicit actions in furtherance of the conspiracy.

174.    Among other things, the BSA establishes regulatory requirements for the maintenance of adequate AML compliance programs and imposes specific recordkeeping and reporting obligations on various financial institutions, including money service businesses ("MSBs") such as virtual currency exchanges.[5]

175.    As stated in 31 U.S.C. § 5311, the purpose of the BSA is to require certain reports or records that have a high degree of usefulness in criminal, tax, or regulatory investigations or

---

[4] The BSA is codified at 12 U.S.C. §§ 1829b, 1951-1959 and 31 U.S.C. §§ 5311-5314, 5316-5332. Regulations implementing the BSA appear at 31 C.F.R. Chapter X.

[5] Exchangers of convertible virtual currency (that is, cryptocurrency exchanges) are "money transmitters" as defined in 31 C.F.R § 1010.100(ff)(5) and "financial institutions" as defined in 31 C.F.R § 1010.100(t), and must comply with BSA regulations. A foreign-located business qualifies as an MSB if it does business as an MSB "wholly or in substantial part within the United States." 31 C.F.R. § 1010.100(ff); 31 U.S.C. §§ 5312(a)(6), 5312(b), and 5330(d). As noted above, due to regulatory restrictions, binance.com is not supposed to be available to users in the United States, but it appears that residents of the U.S. (*i.e.*, Brandon and Cookie) may have used binance.com to receive and trade Kowalski's Stolen Bitcoin. Brandon and Cookie were eligible to use Binance.US as U.S. residents and, in Brandon's case, a U.S. citizen (*see* ¶ 236, *infra*).

EXHIBIT A

proceedings, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism and financial crime.

176. Binance violated at least three major components of the BSA.

177. First, Binance failed to perform adequate customer due diligence and know-your-customer procedures at the time the Individual Defendants opened accounts at Binance, which allowed the Individual Defendants to then launder Kowalski's Stolen Bitcoin through the exchange. Basic customer due diligence and KYC would have uncovered the fact that the source of funds entering these accounts was a digital address that had been publicly linked to prior cybercrimes involving the theft of cryptocurrency such as BTC from their lawful owners. As alleged above, industry news reports and posts concerning the First Recipient Address and its involvement in the Electrum hacks appeared as early as February 9, 2019.

178. Second, Binance also failed to utilize adequate AML transaction monitoring software systems to review and flag suspicious money laundering transactions on its exchange. The Individual Defendants engaged in a slew of obvious money laundering activities, which should have been instantly flagged by standard AML transaction monitoring software and then investigated by a trained financial crime compliance employee. If Binance had performed these AML transaction monitoring responsibilities as required under the BSA, the Individual Defendants' early money laundering attempts would have been stopped in their tracks, Kowalski's Stolen Bitcoin would never have been dissipated, and Binance would have timely filed SARs with FinCEN, thereby alerting the United States Government of the financial crime at an early stage when it could have responded in an effective manner.

179. Third, upon information and belief, Binance has not filed (much less timely filed) the requisite SARs tied to the Individual Defendants' transactions on its exchange. Binance was

EXHIBIT A

legally obligated to file SARs within thirty days of the first suspicious pattern of money laundering transactions tied to Kowalski's Stolen Bitcoin, which occurred on September 7, 2020. Kowalski's representatives specifically notified Binance of the transactions by October 5, 2020, and Kowalski provided his investigatory and forensic findings to Binance, leaving no doubt that Binance was under a legal duty to file SARs with FinCEN within thirty days of receiving these notices.

180.    Binance's failure to comply with these obligations concealed the Individual Defendants' fraud, enabled the Individual Defendants to continue their illegal activity and dissipate the proceeds of the crime, and enabled Binance to continue to earn significant fees from these transactions.

181.    As alleged in detail below, Binance acted in furtherance of the conspiracy in at least four ways: (1) by refusing to freeze the six Binance Accounts; (2) by thwarting Kowalski's efforts to discover information necessary to prevent further dissipation of his Stolen Bitcoin; (3) by allowing the Individual Defendants to continue to effectuate illicit transactions on its exchange, including accepting additional deposits of Stolen Bitcoin and facilitating the exchange of Stolen Bitcoin for Monero, which the Individual Defendants then transferred out of the Binance Accounts; and (4) by failing to comply with its reporting and other obligations under the BSA, which concealed the Individual Defendants' fraud, enabled them to continue their illegal activity and to dissipate the proceeds of the crime, and enabled Binance to continue to earn fees from these illicit transactions.

182.    Binance has the right to suspend a user's account or freeze any assets held in that account if Binance believes that the user has contravened any applicable laws or regulations. Section VI, paragraph 2 of Binance Holdings' Terms of Use states that "(i)f Binance is informed that any Digital Asset or funds held in your Binance Account are stolen or otherwise are not

EXHIBIT A

lawfully possessed by you, Binance may, but has no obligation to, place an administrative hold on the affected funds and your Binance Account."

183.    However, even after being put on notice of the theft of Kowalski's Bitcoin and that Stolen Bitcoin had been deposited into the six Binance Accounts, Binance did not freeze these addresses or accounts (except, at the most, for a few days in October 2020).

184.    Since early October 2020, Kowalski's representatives, including Kroll, Coinfirm, and his English attorneys Mishcon de Reya ("Mishcon"), have repeatedly communicated with Binance to inform it that Kowalski's Stolen Bitcoin were being laundered through Binance and to enlist Binance's cooperation in preventing further dissipation of the Stolen Bitcoin.

185.    Beginning on or about October 5, 2020, members of Coinfirm and Binance participated in a chat group on the messaging app Telegram. In these discussions, Coinfirm identified specific Binance addresses that had received funds from the Electrum wallet malware phishing scams – including details of the First through Fourth Addresses, into which some of Kowalski's Stolen Bitcoin had been sent at that time – and requested that Binance freeze any withdrawals from those addresses.

186.    In subsequent communications, Coinfirm also provided supporting documentation for its tracing investigation, as well as enhanced AML reports on the suspicious addresses.

187.    Binance initially responded that it would "take at least temporary action against these accounts [the First to Fourth Addresses]," but eventually informed Coinfirm that Binance was "not going to be able to keep these accounts restricted long-term without law enforcement involvement." While confirming that these suspicious accounts "belong to the same person," Binance stated that the account holder had claimed that he had purchased the stolen Bitcoin in exchange for Monero, or "XMR."

EXHIBIT A

188.     Although a representative of Binance informed Kowalski's investigators in October 2020 that the First through Fourth Addresses belonged to the same person, documents that Binance was ultimately ordered to produce show that these addresses are in fact owned by Brandon, Cookie, Wai, and Lee, respectively.

189.     The fact that Binance, which had "full KYC [know your customer]" information on the account holders and full access to the transaction history in these accounts, advised Kowalski that they were jointly controlled means either that Binance was not telling Kowalski's investigators the truth, or it was telling the truth, in which case Binance knew that one person had set up and controlled four accounts under different identities. Despite the lack of any legitimate reason for the latter, Binance nevertheless permitted the Stolen Bitcoin to be deposited into and then traded and withdrawn from that customer's accounts.

190.     Coinfirm reviewed the available evidence with Binance, explaining that the holder of the First to Fourth Addresses acted "like a typical hacker layering scheme used to hide the real origination of funds."

191.     Incredibly, while agreeing that "*it is true that it is highly likely the paths leading to this account are malicious*," Binance ultimately unfroze the four addresses (if they ever were, in fact, frozen), informing Coinfirm that law enforcement involvement would be required for it to take further action.

192.     Binance also claimed that the account holder's "identity is not hidden," and that it had "full KYC and non-VPN IP access." Binance stated that even if the account holder "was trading with the attacker(s), *as it sounds like he was*," stolen funds nevertheless could have reached the account innocently.

EXHIBIT A

193.    Nevertheless, Binance confirmed on October 14, 2020 that the owner of the First to Fourth Addresses had been warned not to transact with the purported Monero buyer, and that if funds continued to flow to those accounts from the Electrum wallets, Binance would need to address it further.

194.    While Binance pretended to Kowalski's investigators that it would intercede, in furtherance of the conspiracy Binance did not follow through on the warning, and no further action was taken to restrict these addresses or accounts even after they continued to receive Stolen Bitcoin. In fact, as much as 168 BTC of the Stolen Bitcoin was deposited into the First Binance Address after October 14, 2020, which Binance then allowed to be dissipated out of that account.

195.    Over the next several months, Kowalski's investigators and lawyers repeatedly notified Binance that Stolen Bitcoin continued to flow into these accounts, but Binance's response was uncooperative and evasive.

196.    In letters dated October 26, 2020 and October 30, 2020, Kroll wrote to Binance and various of its affiliates to place "Binance on notice that we have evidence" that the Stolen Bitcoin are "the proceeds of crime," and that Kroll was "aware of other victims of Electrum wallet update compromises whose stolen assets also trace to one or more" of the illicit addresses identified by Kroll.

197.    By email dated October 28, 2020, a representative of Binance responded that it had "checked the addresses" Kroll provided and "unfortunately, there are no assets left." That was not surprising, because exchanges usually move their customers' BTC into pooling accounts after it is deposited. Binance did not confirm, however, whether assets remained in other accounts associated with the Individual Defendants, or in such pooled accounts.

EXHIBIT A

198.    Binance further stated that its "protocol" required that it communicate with law enforcement directly. That statement was false. In October 2020, Markus Reuβner of the German State Criminal Police contacted Binance and sought confirmation that Binance would stop any further transfer of Kowalski's Stolen Bitcoin.  Mr. Reuβner stated that he had evidence to prove the unlawfulness of the transactions to the Binance addresses and proof to show that the First Recipient Address belonged to the perpetrators of the Electrum fraud scheme. Binance responded that it would cooperate only if it received indemnity from the German police.

199.    Kroll sent follow up communications through February 2021 seeking to obtain additional information from Binance, but it never received a response.

200.    Mishcon also placed Binance on notice of the theft of Kowalski's Bitcoin and the use of its exchange to launder the proceeds. In letters sent between November 2020 and February 2021, Mishcon provided background information about the theft of Kowalski's Bitcoin and identified the illicit addresses where the Stolen Bitcoin had been transferred.

201.     On November 25, 2020, Mishcon notified Binance that between October 16 and November 16, 2020, an additional 16 BTC of Stolen Bitcoin had been deposited into the First Binance Address (owned by Brandon).

202.    On February 2, 2021, Mishcon notified Binance that another 95 BTC of the Stolen Bitcoin had been deposited into an address at Binance that had not previously received Stolen Bitcoin, namely the Fifth Address (owned by Nurlan).

203.    On February 4, 2021, Mishcon notified Binance that another 23 BTC of the Stolen Bitcoin had been deposited into another address (the Sixth Address, owned by Oksana) on February 1, 2021.

EXHIBIT A

204.    The only response Mishcon received was from a representative of Binance Asia (to whom Kroll had specifically been directed by Binance) stating that the company had nothing to do with the matter.

205.    When Kowalski's lawyers and investigators asked Binance straightforward questions about its structure and location in order to ascertain which Binance entity holds information about the six Binance Accounts, Binance refused to answer.

206.    Binance prevaricated about turning over any specific information in its dealings with Kowalski's representatives and ultimately ceased all further communications with Kowalski and German law enforcement without producing any further information about the illicit addresses tied to the theft.

207.    In the meantime, Binance permitted the Individual Defendants to continue transferring the Stolen Bitcoin out of said addresses, including by using the Stolen Bitcoin to buy Monero and then withdrawing the Monero from their Binance accounts. That pattern did not change even after Binance was given clear evidence that the bitcoin deposited into those accounts had been stolen from Kowalski.

208.    Binance permitted and facilitated these transactions with full knowledge that they involved the proceeds of crime.

**B.    Kraken's Role in the Conspiracy**

209.    On or before September 7, 2020, Kraken agreed to join the conspiracy. Specifically, Kraken agreed to facilitate the attempted laundering and ultimate dissipation of Plaintiff's Stolen BTC by: (a) accepting Plaintiff's Stolen BTC into the Individual Defendants' (or their co-conspirators') Kraken accounts; (b) declining to implement AML and KYC controls that would have required Kraken to freeze the Individual Defendants' accounts and report the

EXHIBIT A

suspicious activity to regulators and law enforcement; (c) allowing the Individual Defendants to launder and dissipate Plaintiff's Stolen BTC through Kraken; (d) concealing material information from Plaintiff and his representatives; and (e) refusing to freeze the Individual Defendants' accounts despite knowing the accounts contained Plaintiff's Stolen BTC.

210.   It is very likely that discovery will show a pattern similar to that for the Binance Accounts, *i.e.*, the exchange of Stolen Bitcoin for Monero or another cryptocurrency and the subsequent transfer of that cryptocurrency out of the Kraken Accounts, just as Binance facilitated for the Individual Defendants.

211.   Kraken was on notice that Kowalski's Stolen Bitcoin had been transferred to its exchange.  The theft was publicized no later than August 30, 2020.  The First Recipient Address had been publicized multiple times as a BTC address utilized by criminals to receive stolen BTC. Despite the Individual Defendants' attempts to obfuscate the source of the BTC, as demonstrated through the investigation performed by Kowalski's investigators, the BTC deposited in the Individual Defendants' accounts at the Exchanges was traceable back to Kowalski's Electrum wallet.

212.   Despite that knowledge, Kraken failed to take any action against the criminal activity and later failed to provide Kowalski's representatives with any information concerning the addresses tied to the theft, thereby facilitating the dissipation of Kowalski's Stolen Bitcoin.

213.   Kraken failed to comply with its AML obligations under the BSA by failing to perform customer due diligence and transaction monitoring in order to investigate suspicious money laundering activity and then timely file a SAR with FinCEN as legally required under the BSA. Its failures to do so constitute actions in furtherance of the conspiracy.

EXHIBIT A

214.    First, Kraken failed to perform adequate customer due diligence and know-your-customer procedures at the time the Individual Defendants or their co-conspirators opened accounts at Kraken, which allowed the Individual Defendants to then launder Kowalski's Stolen Bitcoin through Kraken. Basic customer due diligence and KYC would have uncovered the fact that the source of funds entering these accounts was a digital address that had been publicly linked to prior cybercrimes involving the theft of cryptocurrency such as BTC from their lawful owners. Industry news reports and posts concerning the First Recipient Address and its involvement in the Electrum hacks appeared as early as February 9, 2019.

215.    Second, Kraken also chose not to utilize adequate AML transaction monitoring software systems to review and flag suspicious money laundering transactions on their exchanges. The Individual Defendants engaged in a slew of obvious money laundering activities, which should have been instantly flagged by standard AML transaction monitoring software and then investigated by a trained financial crime compliance employee. If Kraken had performed these AML transaction monitoring responsibilities as required under the BSA, the Individual Defendants' early money laundering attempts would have been stopped in their tracks, Kowalski's Stolen Bitcoin would never have been dissipated, and Kraken would have timely filed SARs with FinCEN, thereby alerting the United States Government of the financial crime at an early stage when it could have responded in an effective manner.

216.    Third, upon information and belief, Kraken has not filed (much less timely filed) the requisite SARs tied to the Individual Defendants' transactions on its exchange. Kraken was legally obligated to file SARs within thirty days of the first suspicious pattern of money laundering transactions tied to Kowalski's Stolen Bitcoin, which occurred on September 7, 2020. As alleged above, Binance and Kraken were on notice of those transactions as of at least October 5, 2020, and

EXHIBIT A

November 16, 2020, respectively. Moreover, Kowalski provided details regarding the tracing analysis his investigators had performed, leaving no doubt that Kraken was under a legal duty to file SARs with FinCEN within thirty days of receiving these notices.

217.    Kraken's failure to comply with these obligations concealed the Individual Defendants' fraudulent scheme, enabled the Individual Defendants to continue their illegal activity and dissipate the proceeds of the crime, and enabled Kraken to continue to earn significant fees from patently illicit transactions.

218.    On November 16, 2020, Silver Miller, a U.S. law firm retained by Kowalski, wrote to Marco Santori, Kraken's Chief Legal Officer. The letter explained that approximately 1,400 BTC had been stolen from Kowalski and that, as of November 16, 2020, at least 79 BTC of that Stolen Bitcoin had been transferred to 14 Kraken addresses. The letter identified the specific addresses into which the Stolen Bitcoin had been transferred and was specifically designed "to put Kraken on notice" that Silver Miller had "evidence that these stolen assets are the proceeds of a crime[.]" The letter requested, among other things, that Kraken freeze all assets in the relevant accounts pending a recovery process and that Kraken preserve details of any transfers out of the relevant accounts. It also requested that "Kraken expeditiously undertake that effort voluntarily and file the necessary Suspicious Activity Reports (SARs) with the appropriate legal authorities."

219.    Kraken's only response was a short letter stating that Silver Miller had not provided sufficient information and would need to seek a court order from a competent jurisdiction. The letter gave no indication that Kraken would even investigate the serious nature of the information provided by Silver Miller about a portion of Kowalski's Stolen Bitcoin being laundered through Kraken.

EXHIBIT A

220.    In a follow-up letter dated January 19, 2021, Silver Miller provided further details of the tracing and explained that, by that point, 190 BTC of the Stolen Bitcoin had been traced into thirty-one Kraken addresses.[6] It asked that Kraken perform enhanced due diligence on the accounts identified in the trace and "undertake any procedural reporting not already undertaken that is appropriate under the circumstances" following notice to Kraken that "stolen funds are being housed on [Kraken's] exchange."

221.    No further response was received from Kraken.

222.    Even after Silver Miller notified Kraken of the theft and that its exchange housed the proceeds of a crime, Stolen Bitcoin continued to flow to the Kraken Addresses, with additional transfers being made on December 26, 2020 and May 12, 2021.

## COUNT I

## CIVIL CONSPIRACY

223.    Plaintiff realleges paragraphs 1-222 as if fully set forth herein.

224.    Defendants conspired to carry out the theft, laundering, and dissipation of Plaintiff's Bitcoin.

225.    In or around August 2020, the Individual Defendants agreed to work together to steal BTC from users who use an Electrum wallet to store, sign, and send their BTC, including Plaintiff, by executing malware phishing scams, laundering the BTC, and then dissipating the Stolen BTC.

226.    The particular malware phishing attack that the Individual Defendants agreed to carry out involved adding a malicious server to the legitimate Electrum network of servers, causing

---

[6] Kowalski's investigators subsequently discovered an additional six Kraken addresses that have received Kowalski's Stolen Bitcoin, bringing the total to thirty-seven.

EXHIBIT A

a popup notification to trick users like Plaintiff into downloading a malicious version of the Electrum software falsely identified as an upgrade.  The malicious Electrum wallet software then allows the thieves to hijack the owner's Electrum wallet and send the victim's BTC to a Bitcoin wallet controlled by the thieves.

227.    The Individual Defendants also agreed to attempt to launder the Stolen BTC, by executing hundreds of BTC transactions through a group of private wallets in a scheme known as "layering."

228.    The Individual Defendants further agreed to transfer Kowalski's Stolen Bitcoin to large exchanges like Binance and Kraken, and then exchange the BTC for other cryptocurrency, such as Monero, and then withdraw the cryptocurrency.  The Individual Defendants and the Exchanges knew this process would be untraceable.

229.    On or before September 7, 2020, Binance agreed to join the conspiracy. Specifically, Binance agreed to facilitate the attempted laundering and ultimate dissipation of Plaintiff's Stolen BTC by: (a) accepting Plaintiff's Stolen BTC into the Individual Defendants' Binance accounts despite previously and falsely announcing through its Chief Executive Officer, Changpeng Zhao, that Binance would blacklist the stolen BTC after learning of the theft in August; (b) declining to implement AML and KYC controls that would have required Binance to freeze the Individual Defendants' accounts and report the suspicious activity to regulators and law enforcement; (c) allowing the Individual Defendants to launder and dissipate Plaintiff's Stolen BTC through Binance; (d) concealing material information from Plaintiff and his representatives; (e) making affirmative misrepresentations to Plaintiff and his representatives; (f) refusing to freeze the Individual Defendants' accounts despite knowing the accounts contained Plaintiff's Stolen BTC; and (g) fraudulently maintaining that the Individual Defendants provided a plausible

EXHIBIT A

explanation for their patently illegal transactions to steal and attempt to launder Plaintiff's Stolen BTC.

230.    On or before September 7, 2020, Kraken agreed to join the conspiracy. Specifically, Kraken agreed to facilitate the attempted laundering and ultimate dissipation of Plaintiff's Stolen BTC by: (a) accepting Plaintiff's Stolen BTC into the Individual Defendants' (or their co-conspirators') Kraken accounts; (b) declining to implement AML and KYC controls that would have required Kraken to freeze the Individual Defendants' accounts and report the suspicious activity to regulators and law enforcement; (c) allowing the Individual Defendants to launder and dissipate Plaintiff's Stolen BTC through Kraken; (d) concealing material information from Plaintiff and his representatives; and (e) refusing to freeze the Individual Defendants' accounts despite knowing the accounts contained Plaintiff's Stolen BTC.

231.    Each of the Defendants acted in concert in furtherance of their common plan.

232.    Specifically, the Individual Defendants agreed to work together to hack Plaintiff's Electrum wallet, steal his BTC, transfer it to their control through hundreds of illicit layering transactions, and then either retain or dissipate those assets.

233.    Brandon and Cookie committed tortious acts in furtherance of the conspiracy while in Florida. Those acts included, among other things, hacking Plaintiff's Electrum wallet, laundering the Stolen Bitcoin through hundreds of layering transactions, transferring the Stolen Bitcoin into their accounts at Binance and Kraken, and then dissipating the Stolen Bitcoin, including by exchanging it for Monero and then withdrawing the Monero from their accounts.

234.    For example, customer and trading data produced by Binance shows that Brandon's Binance Account received Stolen Bitcoin between September 8, 2020 and January 13, 2021, and that Brandon made regular orders from that account between September 8, 2020 and March 24,

EXHIBIT A

2021, and regular withdrawals from that account between September 8, 2020 and April 26, 2021. All of these transactions were effectuated while Brandon was living in Florida.

235.    Similarly, the customer and trading data produced by Binance shows that Cookie's Binance Account received Stolen Bitcoin between September 7, 2020 and September 22, 2020, and that Cookie made orders from that account in September, October and December 2020, and made withdrawals from that account in September and October 2020 and January 2021. All of these transactions were effectuated while Cookie was living in Florida.

236.    According to Binance.US's Terms of Use (which are publicly available on its website at https://www.binance.us/en/terms-of-use), its services are available to "U.S. Persons" who are not residents of a "Restricted State." "U.S. Person" is defined to include, *inter alia*, a citizen of the United States or a United States resident, which includes "(1) a green card holder; or (2) an individual physically present in the U.S. for 31 days in the current calendar year and 183 days during the three year period that includes the current year and the two years immediately before that, counting: (a) all the days present in the U.S. in the current year; (b) 1/3 of the days present in the U.S. in the first year before the current year; and (c) 1/6 of the days present in the U.S. in the second year before ethe current year; (3) an individual designated a resident for U.S. tax purposes; or (4) an individual with a U.S. mailing address." Florida is not one of the "Restricted States."  Because Brandon and Cookie are U.S. residents, and Brandon is a U.S. citizen, they both were eligible to use the binance.us platform.

237.    Binance knowingly assisted, furthered, encouraged and concealed the conspiracy by, among other things:

> a.  Failing to maintain a freeze on the Binance Accounts after it was notified that those accounts were being used to move the proceeds of a crime;

EXHIBIT A

b.  Refusing to provide Kowalski's lawyers and investigators with, and thwarting their efforts to otherwise obtain, information necessary to prevent the further dissipation of his Stolen Bitcoin;

c.  Knowingly permitting the continued use of its exchange to launder the proceeds of the crime, including by continuing to allow transfers of Stolen Bitcoin into the Binance Accounts even after it was notified of the theft and that those accounts were being used to move the proceeds of crime;

d.  Knowingly facilitating the exchange of Stolen Bitcoin for Monero and the subsequent withdrawal of that Monero from the Individual Defendants' accounts, thereby assisting in the dissipation of Plaintiff's Stolen Bitcoin;

e.  Failing to perform adequate customer due diligence and KYC procedures at the time the Individual Defendants opened accounts at Binance;

f.  Failing to utilize adequate AML transaction monitoring software systems to review and flag the Individual Defendants' suspicious money laundering transactions on its exchange; and

g.  Failing to file the requisite SARs tied to the Individual Defendants' transactions on its exchange.

238.  Kraken knowingly assisted, furthered, encouraged and concealed the conspiracy by, among other things:

a.  Failing to freeze the Kraken Accounts after it was notified that those accounts were being used to move the proceeds of a crime;

51

EXHIBIT A

b. Refusing to provide Kowalski's lawyers and investigators with, and thwarting their efforts to otherwise obtain, information necessary to prevent the further dissipation of his Stolen Bitcoin;

c. Knowingly permitting the continued use of its exchange to launder the proceeds of a crime, including by continuing to allow transfers of Stolen Bitcoin into the Kraken Accounts even after it was notified of the theft and that those accounts were being used to move the proceeds of crime;

d. Failing to perform adequate customer due diligence and KYC procedures at the time the Kraken Accounts were opened;

e. Failing to utilize adequate AML transaction monitoring software systems to review and flag the Individual Defendants' suspicious money laundering transactions on its exchange; and

f. Failing to file the requisite SARs tied to the Individual Defendants' transactions on its exchange.

239.    As a direct and proximate result of Defendants' unlawful conspiracy, Plaintiff suffered the loss of 1,400.00009854 BTC.

240.    Defendants' conspiracy renders them all subject to personal jurisdiction in Florida and jointly and severally liable for Plaintiff's damages.

**COUNT II**

**CONVERSION**

241.    Plaintiff realleges paragraphs 1-222 as if fully set forth herein.

EXHIBIT A

242.    On August 29, 2020, at the time of the hack, Plaintiff owned and had the right to immediately possess the 1,400.00009854 BTC that were taken from him, not just a mere right to payment for the value of those cryptocurrencies.

243.    The Stolen Bitcoin at issue are specific, identifiable property that can be traced to the Individual Defendants' accounts on the Binance and Kraken exchanges.

244.    When the Stolen Bitcoin were transferred to the Binance and Kraken Accounts, the Individual Defendants intentionally took possession of and assumed control over the Stolen Bitcoin.

245.    The Individual Defendants have intentionally exercised control, and continue to exercise control, over the Stolen Bitcoin and/or the proceeds thereof in such a way as to exclude Plaintiff from using or possessing it.

246.    As such, the Individual Defendants wrongfully converted the Stolen Bitcoin.

247.    In addition, the Exchanges knowingly, willingly, and actively converted Plaintiff's Stolen Bitcoin by taking portions of the Stolen Bitcoin in fees and holding the Stolen Bitcoin within the Exchanges despite Plaintiff's demands that it be preserved and returned.

248.    As co-conspirators, all Defendants are liable for the conversion committed by the Individual Defendants.

249.    As a direct and proximate result of the foregoing, Plaintiff suffered the wrongful conversion of his Stolen Bitcoin.

250.    By virtue of the foregoing, Plaintiff is entitled to compensatory damages in an amount to be determined at trial, but presently believed to be well in excess of $80,000,000.00, together with interest and costs.

EXHIBIT A

## COUNT III

## CIVIL THEFT (Florida Statutes §§ 772.11, 812.014)

251.　Plaintiff realleges paragraphs 1-222 as if fully set forth herein.

252.　On August 29, 2020, at the time of the hack, Plaintiff owned and had the right to immediately possess the 1,400.00009854 BTC that were taken from him, not just a mere right to payment for the value of those cryptocurrencies.

253.　The Stolen Bitcoin at issue are specific, identifiable property that can be traced to the Individual Defendants' accounts on the Binance and Kraken exchanges.

254.　When the Stolen Bitcoin were transferred to the Binance and Kraken Accounts, the Individual Defendants intentionally took possession of and assumed control over the Stolen Bitcoin.

255.　The Individual Defendants have intentionally exercised control, and continue to exercise control, over the Stolen Bitcoin in such a way as to exclude Plaintiff from using or possessing it.

256.　The Individual Defendants knew that the property they received was stolen or obtained in a manner constituting theft.

257.　The Individual Defendants knowingly obtained Plaintiff's BTC with the intent to permanently deprive Plaintiff of its use.

258.　In addition, the Exchanges knowingly, willingly, and actively converted Plaintiff's Stolen Bitcoin by taking portions of the Stolen Bitcoin in fees and holding the Stolen Bitcoin within the Exchanges despite Plaintiff's demands that it be preserved and returned.

259.　As a direct and proximate result of the foregoing, Plaintiff suffered the wrongful conversion of his Stolen Bitcoin.

EXHIBIT A

260.    Plaintiff made a written demand to Defendants for treble damages pursuant to Fla. Stat. § 772.11(1) at the time he served the Complaint on Defendants.[7]

261.    As co-conspirators, all Defendants are liable for the theft committed by the Individual Defendants.

262.    By virtue of the foregoing, Plaintiff suffered compensatory damages in an amount to be determined at trial, but presently believed to be well in excess of $80,000,000.00, together with interest and costs.

263.    By virtue of the foregoing, Plaintiff is entitled to entry of a judgment against Defendants for treble damages pursuant to Fla. Stat. § 772.11, together with interest, costs, and attorney's fees.

## COUNT IV

## FRAUD

264.    Plaintiff realleges paragraphs 1-222 as if fully set forth herein.

265.    The Individual Defendants induced Plaintiff to download a malicious version of the Electrum wallet through false statements of material fact, namely a pop-up that instructed Plaintiff to install what purported to be a legitimate security update.

266.    The Individual Defendants knew the security update was not legitimate and was instead malicious software that would enable them to hijack Plaintiff's Electrum wallet.

267.    The Individual Defendants intended for Plaintiff to rely on their false statements of material fact and download the malicious software so that they could hijack Plaintiff's Electrum wallet and steal his BTC.

---

[7] Plaintiff is, with good reason, very concerned about tipping off the Individual Defendants for fear that they will further dissipate the Stolen Bitcoin or derivatives thereof. For that reason, he will comply with the demand requirement at the time of service.

EXHIBIT A

268.    Plaintiff justifiably relied on the Individual Defendants' false statements of material fact, which proximately caused him damages in an amount to be determined at trial.

269.    In addition, Binance made false representations of fact to Plaintiff and his representatives in order to thwart their investigation and recovery of Plaintiff's Stolen Bitcoin.

270.    Defendants' fraudulent conduct evidences a high degree of moral turpitude and wanton dishonesty, which entitles Plaintiff to recover exemplary damages.

271.    As co-conspirators, all Defendants are liable for the fraud committed by the Individual Defendants.

272.    By virtue of the foregoing, Plaintiff is entitled to compensatory and exemplary damages, together with interest and costs.

**COUNT V**

**UNJUST ENRICHMENT**

273.    Plaintiff realleges paragraphs 1-222 as if fully set forth herein.

274.    Plaintiff conferred a direct benefit upon Defendants by providing the extremely valuable cryptocurrency that Defendants conspired to steal and thereafter wrongfully retain or dissipate.

275.    Defendants have knowledge of the benefit Plaintiff conferred upon them and have retained such benefit.

276.    By their wrongful acts, Defendants were unjustly enriched at the expense of and to the detriment of Plaintiff.

277.    It is against equity and good conscience to permit Defendants to retain the benefits of their fraudulent scheme.

EXHIBIT A

278. Equity requires that Defendants return to Plaintiff the benefits he conferred upon them.

279. By virtue of the foregoing, Plaintiff is entitled to a recovery against Defendants equal to the amount by which Defendants were unjustly enriched, together with interest and costs.

280. In addition to damages, Plaintiff is also entitled to disgorgement of any profits Defendants have earned as a result of their conspiracy.

## COUNT VI

### IMPOSITION OF A CONSTRUCTIVE TRUST AND DISGORGEMENT

281. Plaintiff realleges paragraphs 1-222 as if fully set forth herein.

282. This is an action to impose a constructive trust upon the property taken from Plaintiff that is currently held by Defendants.

283. This action further calls for the restoration to Plaintiff of that wrongfully obtained property.

284. As set forth above, Defendants – through fraud, conversion, theft, or other questionable means – obtained Plaintiff's BTC, which in equity and good conscience Defendants should not be permitted to hold.

285. The Stolen Bitcoin at issue are specific, identifiable property that can be traced in the Binance Accounts and Kraken Accounts, in other accounts owned by the Individual Defendants at Binance or Kraken, and/or in pooled accounts or "hot wallets" at Binance and Kraken.

286. Any and all such assets being held by the Defendants in the Binance and Kraken Accounts, in other accounts controlled by the Individual Defendants at Binance or Kraken, or in pooled accounts or "hot wallets" at Binance or Kraken must be held in trust for Plaintiff's benefit,

EXHIBIT A

as Defendants are not entitled to the benefit of wrongfully converted and Stolen Bitcoin that were taken from Plaintiff.

287.    Any Stolen Bitcoin identified herein must be disgorged to Plaintiff's benefit, as Defendants are not entitled to the benefit of wrongfully converted and stolen Bitcoin that were taken from Plaintiff.

288.    By virtue of the foregoing, Plaintiff is entitled to the imposition of a constructive trust over the property taken from Plaintiff that is currently held by Defendants and restoration of such wrongfully obtained property to Plaintiff.

289.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs of this Complaint as if fully set forth herein and below.

## COUNT VII

## AIDING AND ABETTING AGAINST THE EXCHANGES

290.    Plaintiff realleges paragraphs 1-222 as if fully set forth herein.

291.    The Individual Defendants unlawfully formed a conspiracy to steal Plaintiff's Stolen Bitcoin, launder it, and then dissipate it; unlawfully converted Plaintiff's Stolen Bitcoin; committed civil theft of Plaintiff's Stolen Bitcoin, and defrauded Plaintiff.

292.    The Exchanges had actual and detailed knowledge of the Individual Defendants' conspiracy, conversion, civil theft, and fraud.

293.    Binance knowingly and substantially assisted, furthered, encouraged and concealed the conspiracy by, among other things:

> a.    Failing to maintain a freeze on the Binance Accounts after it was notified that those accounts were being used to move the proceeds of a crime;

58

EXHIBIT A

b. Refusing to provide Kowalski's lawyers and investigators with, and thwarting their efforts to otherwise obtain, information necessary to prevent the further dissipation of his Stolen Bitcoin;

c. Knowingly permitting the continued use of its exchange to launder the proceeds of the crime, including by continuing to allow transfers of Stolen Bitcoin into the Binance Accounts even after it was notified of the theft and that those accounts were being used to move the proceeds of crime;

d. Knowingly facilitating the exchange of Stolen Bitcoin for Monero and the subsequent withdrawal of that Monero from the Individual Defendants' accounts, thereby assisting in the dissipation of Plaintiff's Stolen Bitcoin;

e. Failing to perform adequate customer due diligence and KYC procedures at the time the Individual Defendants opened accounts at Binance;

f. Failing to utilize adequate AML transaction monitoring software systems to review and flag the Individual Defendants' suspicious money laundering transactions on its exchange; and

g. Failing to file the requisite SARs tied to the Individual Defendants' transactions on its exchange.

294. Kraken knowingly and substantially assisted, furthered, encouraged and concealed the conspiracy by, among other things:

a. Failing to freeze the Kraken Accounts after it was notified that those accounts were being used to move the proceeds of a crime;

EXHIBIT A

b.  Refusing to provide Kowalski's lawyers and investigators with, and thwarting their efforts to otherwise obtain, information necessary to prevent the further dissipation of his Stolen Bitcoin;

c.  Knowingly permitting the continued use of its exchange to launder the proceeds of a crime, including by continuing to allow transfers of Stolen Bitcoin into the Kraken Accounts even after it was notified of the theft and that those accounts were being used to move the proceeds of crime;

d.  Failing to perform adequate customer due diligence and KYC procedures at the time the Kraken Accounts were opened;

e.  Failing to utilize adequate AML transaction monitoring software systems to review and flag the Individual Defendants' suspicious money laundering transactions on its exchange; and

f.  Failing to file the requisite SARs tied to the Individual Defendants' transactions on its exchange.

295.   Without the Exchanges' substantial assistance, the Individual Defendants would not have been able to complete the object of their conspiracy and successfully steal, launder, and dissipate Plaintiff's Stolen Bitcoin.

296.   As a direct and proximate result of the Exchanges' aiding and abetting of the Individual Defendants' conspiracy, conversion, civil theft, and fraud, Plaintiff has suffered damages in an amount to be determined at trial but presently estimated to be well in excess of $80,000,000.00.

EXHIBIT A

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief against Defendants jointly and severally, as follows:

A.      An award of compensatory damages in respect of the Stolen Bitcoin in an amount to be determined at trial, but presently estimated to be well in excess of $80,000,000.00;

B.      An award of treble damages on Plaintiff's claim for civil theft under Fla. Stat. § 772.11;

C.      Exemplary damages based upon the intentional and egregious nature of Defendants' actions;

D.      Imposition of a constructive trust over the property taken from Plaintiff that is currently being held by Defendants;

E.      An order requiring that Plaintiff's Stolen Bitcoin, to the extent it can be traced, be restored to Plaintiff;

F.      An accounting of the Stolen Bitcoin and all sums received by Defendants, jointly and severally, through the conspiracy and any proceeds thereof (the "Ill-Gotten Gains");

G.      Disgorgement from Defendants of all Ill-Gotten Gains;

H.      An award of attorneys' fees and costs to Plaintiff; and

I.      Such other and further relief in Plaintiff's favor as the Court may deem just and proper.

EXHIBIT A

Dated: October 19, 2021

By:    /s/ Patrick G. Brugger

**SHUTTS & BOWEN LLP**
200 South Biscayne Blvd., Suite 4100
Miami, FL 33131
Telephone: (305) 415-9063
Fax: (305) 381-9982
Daniel T. Stabile
*dstabile@shutts.com*
Florida Bar No. 95750
Patrick G. Brugger
*pbrugger@shutts.com*
Florida Bar No. 035418

**MEISTER SEELIG & FEIN LLP**
Alexander D. Pencu (*pro hac vice* to be filed)
adp@msf-law.com
Christopher J. Major (*pro hac vice* to be filed)
cjm@msf-law.com
Kathryn E. Matthews (*pro hac vice* to be filed)
kem@msf-law.com
125 Park Avenue, 7th Floor
New York, NY 10017
Telephone: (212) 655-3500
Fax: (646) 539-3649

*Attorneys for Plaintiff*

EXHIBIT A

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 1.430 of the Florida Rules of Civil Procedure.

Dated: October 19, 2021

By:____/s/ Patrick G. Brugger___ ____


**SHUTTS & BOWEN LLP**
200 South Biscayne Blvd., Suite 4100
Miami, FL 33131
Telephone: (305) 415-9063
Fax: (305) 381-9982
Daniel T. Stabile
*dstabile@shutts.com*
Florida Bar No. 95750
Patrick G. Brugger
*pbrugger@shutts.com*
Florida Bar No. 035418

**MEISTER SEELIG & FEIN LLP**
Alexander D. Pencu (*pro hac vice* to be filed)
adp@msf-law.com
Christopher J. Major (*pro hac vice* to be filed)
cjm@msf-law.com
Kathryn E. Matthews (*pro hac vice* to be filed)
kem@msf-law.com
125 Park Avenue, 7th Floor
New York, NY 10017
Telephone: (212) 655-3500
Fax: (646) 539-3649

*Attorneys for Plaintiff*

EXHIBIT A

**VERIFICATION**

Under penalties of perjury, I, STEVEN PAUL KOWALSKI, declare that I have read the foregoing Verified Complaint for Damages and Equitable Relief, and the facts alleged are true, to the best of my knowledge and belief.

_____
Steven Paul Kowalski

EXHIBIT A